**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

JANE DOE A, JOHN DOE A, & JOHN DOE B, individually, and on behalf of all others similarly situated,

Plaintiffs,

vs.

MARCO RUBIO, in his official capacity as Secretary of State,

Defendant.

CASE NO.: 1:26-cv-3574

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**Plaintiffs, by and through their attorneys, allege as follows:**

## I. PRELIMINARY STATEMENT

1. This class action lawsuit—brought on behalf of federal employees and applicants for U.S. Government posts abroad—seeks to remedy the State Department's Bureau of Medical Services' ("MED") systemic discrimination against employees and applicants with disabilities, in violation of Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, *et seq*. ("Rehabilitation Act"), which prohibits discrimination on the basis of disability in employment by a federal agency.

2. Medical clearances are required for most individuals sent by the U.S. Government to posts abroad for extended duty. The State Department, through MED, determines medical clearances for not only State Department employees, but also for more than 25 other federal agencies (collectively the "Hiring Agencies") that employ Americans abroad. Offers of employment for assignments overseas from these agencies are typically made contingent on receiving MED clearance for the position. In determining whether to grant such clearance, MED consistently applies discriminatory policies, procedures, and practices that fail to engage in an interactive dialogue or individually assess whether employees and applicants with disabilities can, with or without reasonable accommodation, perform the essential job functions of the particular positions they seek.

3. Plaintiffs Jane Doe A, John Doe A, and John Doe B (collectively, "Plaintiffs"), on their own behalf and on behalf of the proposed Class identified below, are qualified individuals, who were conditionally offered overseas federal positions, with perceived, actual, or records of disabilities, who had their employment offers and/or assignments abroad revoked after MED denied them post-specific medical clearance. As a matter of policy, practice, and procedure, the MED improperly denied Plaintiffs medical clearances based on their disabilities, perceived

disabilities, and/or record of disabilities without considering or offering reasonable accommodations.

4. As detailed in the Factual Allegations below, this lawsuit alleges, among other violations, that the State Department has a policy or practice of discriminating against employees and applicants for federal employment on the basis of disability, based on information provided to the State Department about their actual or perceived disabilities or records of disabilities. The State Department fails to conduct individualized assessments based on reasonable judgment that relies on current medical knowledge and on the best available objective evidence, and it fails to consider reasonable accommodations for federal employees and applicants with disabilities when conducting its medical clearance process. The State Department routinely denies federal employees and applicants with disabilities an equal opportunity to participate in and benefit from overseas employment opportunities on account of their disabilities, perceived disabilities, record of disabilities, associated symptoms, and/or their engagement in treatment for their disabilities in violation of the Rehabilitation Act.

5. Congress passed the Rehabilitation Act not only to prohibit discrimination, but in order to "promote and expand employment opportunities in the public and private sectors for handicapped individuals." *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 626 (1984) (citing 29 U.S.C. § 701(8)); *Stutts v. Freeman*, 694 F.2d 666, 668 (10th Cir. 1983) (citing 29 U.S.C. § 701(8)); S. Rep. 890, 95th Cong., 2d Sess. 18-19 (1978), U.S. Code Cong. & Admin. News 1978, 7312, 7329-30.

6. The Government is required to be the "model employer" of individuals with disabilities and "develop affirmative action programs on behalf of handicapped persons." *Gardner v. Morris*, 752 F.2d 1271, 1280 (8th Cir. 1985); *see, e.g.*, *Wallace v. Veterans Admin.*, 683 F. Supp.

758, 760-61 (D. Kan. 1988) (citing *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 302 (5th Cir. 1981) (quoting *Rehabilitation of the Handicapped Program 1976: Hearings Before the Subcommittee on the Handicapped of the Committee on Labor and Public Welfare*, 94th Cong. 1502 (1976))); 29 C.F.R. § 1613.703.

7. As such, the State Department and the Hiring Agencies must not only prevent overt discrimination, but "structure its procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Ryan v. Fed. Deposit Ins. Corp.*, 565 F.2d 762, 763 (D.C. Cir. 1977). Moreover, the federal government may not employ "qualification standards, employment tests or other selection criteria that screen out or tend to screen out…classes of individuals with disabilities, on the basis of disability, unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job related for the position in question and is consistent with business necessity." 29 C.F.R. § 1630.10(a).

8. Many of the standards applied to determine violations of the Rehabilitation Act by U.S. government agencies are the same standards that apply to employment by private companies under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111, *et seq.* Rehabilitation Act, 29 U.S.C. § 791(f).

9. The Rehabilitation Act requires that pre-employment, post-offer medical clearance examinations consider whether an applicant with disabilities can perform the essential job functions of a position with reasonable accommodations. If not, then a determination must be made regarding whether the medical clearance criteria used are necessary to achieve the relevant business purpose. 29 U.S.C. § 791.

10. Successful applicants for overseas positions with the federal government are offered employment conditioned on MED's clearance for the applicant to serve abroad. Medical

clearance levels are described as "classes" in State Department parlance: Class 1 medical clearance indicates that a candidate is cleared to serve at any international post for the U.S. government; Class 2 medical clearance restricts an applicant's employability to certain posts abroad and requires the applicant to obtain post-specific clearance for each new potential post abroad. Applicants who receive Class 2 medical clearance, or Class 5 medical clearance (domestic only), lose their conditional offer of employment if they are not granted post-specific clearance for the position.

11. As a regular practice and policy, MED denies post-specific clearances to applicants with disabilities, perceived disabilities, and/or records of disabilities based solely on conjectured symptoms, and/or treatment requirements of their diagnoses, and without legally compliant individualized assessments that consider objective facts, treating provider medical opinions, potential reasonable accommodations, or agency hardship. The clearance decisions instead reflect MED's position that certain conditions are, across the board, substantially limiting.

12. Hiring Agencies rely entirely on MED's medical clearance decisions in rescinding conditional offers of employment to candidates with Class 2 and Class 5 medical clearances. Hiring Agencies perform no reasonable accommodations analysis of their own, nor do they hire candidates that receive Class 2 or Class 5 medical clearances without a sufficient post-specific medical clearance. Rejection of a candidate denied worldwide or post-specific medical clearance is automatic.

13. Foreign Service Officers who receive Class 2 clearance without post-specific approval are automatically removed from their positions abroad where already impaneled, or have the position offer rescinded where the Officer has not already assumed the post. Further applications to posts abroad are then evaluated by HR personnel, who act as go-betweens with the

Officer and MED for determining to which positions the Officer will be permitted to apply. As a result, Officers with Class 2 clearance are often actively discouraged by HR personnel from seeking employment in certain roles abroad without an opportunity for direct engagement with the evaluating medical personnel.

14. Losing opportunities for posts abroad significantly impacts Plaintiffs' and class members' careers in both the short and long term. For example, federal employees stationed abroad may be granted additional compensation and benefits beyond the basic rate of pay fixed by statute for their employment grade dependent on the conditions of the environment where the employee is posted. Assignments at remote and/or high-conflict posts are also often desirable from a career-advancement perspective, as they are viewed favorably by promotion and tenure committees. Foreign Service Officers not tenured and promoted are eventually forced out of federal service.

15. Plaintiffs and class members seek damages, civil penalties, and declaratory and injunctive relief as set forth below, including an injunction ordering the State Department to comply with the requirements of Section 501 of the Rehabilitation Act, equitable relief for affected applicants and employees, attorneys' fees and costs, and any further relief the Court deems necessary and appropriate. 29 U.S.C. § 791 (citing availability of remedies and provisions set forth in section 717 of the Civil Rights Act of 1964, including the provisions of 42 U.S.C. §§ 2000e-5(g), (k), for actions brought under 29 U.S.C. § 791).

## II. PARTIES

Plaintiffs

16. Representative Plaintiff Jane Doe A is a 55-year-old woman who MED denied post-specific medical clearance to Afghanistan in 2011 based upon her cerebral palsy. The government (United States Agency for International Development, hereinafter USAID) rescinded her

conditional offer for a Foreign Service Officer Limited in Afghanistan automatically as a result of MED's decision. She currently resides in Crofton, Maryland.

17. Representative Plaintiff John Doe A is a 48-year-old man who entered the State Department Foreign Service as a Specialist with a Class 1 ("worldwide available") medical clearance in January 2017. In 2019, while he was working in Sudan, John Doe A was diagnosed with arthritis. MED stripped his Class 1 clearance and then denied him post-specific (Class 2) clearance for Sudan, leading the State Department to revoke his position abroad. He currently resides in Chicago, Illinois.

18. Representative Plaintiff John Doe B is a 43-year-old man. He first joined the State Department Foreign Service in 2006 and was granted a Class 1 ("worldwide available") medical clearance. In 2015, he was diagnosed with Mantle Cell Lymphoma and MED denied him Class 1 medical clearance. The State Department revoked his conditional offer for a position and he was only allowed to work domestically. In 2019, he was denied post-specific medical clearance for opportunities in Algiers, Baku, Cairo, Casablanca, Rabat, and Tunis. He currently works in Taipei City, Taiwan, and maintains a permanent U.S. address in San Diego, California.

19. Plaintiffs are qualified individuals with disabilities protected under Section 501 of the Rehabilitation Act. 29 U.S.C. § 791(f) (citing standards applied under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et seq.*). Each named Plaintiff has a disability because they have an impairment that substantially limits one or more major life activities or major bodily functions, have a record of such an impairment, or were regarded by the State Department as having such an impairment. 42 U.S.C. § 12102. Each named Plaintiff is a qualified individual with a disability because they meet the essential eligibility requirements for applying to and serving in their intended post abroad, with or without a reasonable accommodation, 42 U.S.C. § 12111; 45

C.F.R. § 85.31, and indeed, received conditional offers of employment for those positions before MED denied them post-specific medical clearance based upon Plaintiffs' disabilities, records of disabilities, and perceived disabilities.

Defendant

20. The State Department, including MED, is headquartered in Washington, D.C.

21. The State Department is a cabinet level Executive department within the executive branch of the United States government. 5 U.S.C. § 101. As an Executive department, the State Department is a federal agency and a covered entity pursuant to Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, *et. seq.*; *see also* 29 C.F.R. § 1614.203(b).

22. Defendant Marco Rubio is the Secretary of State, responsible for leading the independent agency. He is sued in his official capacity.

## III. JURISDICTION AND VENUE

23. This action is brought under the Rehabilitation Act to address the ongoing systemic denial of equal access to career opportunities to people with disabilities by the State Department. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

24. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claims set forth herein occurred in this district and because Defendant maintains an office in this district.

## IV. CLASS ACTION ALLEGATIONS

25. Plaintiffs, on behalf of themselves and the proposed Class, allege and incorporate by reference the allegations in the preceding paragraphs.

26. Plaintiffs bring this action pursuant to Rules 23(a), (b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure ("FRCP") on behalf of themselves and the following defined

Class: All applicants for federal employment overseas who were denied post-specific clearance from May 16, 2011,[1] to the present, by the State Department's Office of Medical Services.

27. Numerosity: The proposed Class is so numerous and geographically dispersed that joinder of all members is impracticable. MED conducts thousands of medical clearance evaluations a year. Plaintiffs are aware that during the relevant period, there are at least hundreds of individuals who are dispersed around the country and the world who satisfy the definition of the proposed Class. Moreover, Plaintiffs anticipate that the Class will grow over time because the State Department will continue to maintain the challenged pattern, practices, and/or policies, including denying equal access, opportunities, and benefits of government employment overseas to applicants and employees of federal agencies with disabilities, perceived disabilities, and records of disabilities; failing to conduct individualized assessments based on reasonable judgment that relies on current medical knowledge and on the best available objective evidence; and/or failing to offer or consider reasonable accommodations before denying post-specific clearance to applicants and employees based on disability.

28. Commonality: Common questions of law and fact exist as to all members of the proposed Class, including but not limited to:

a. Whether the State Department has a pattern, practice, and/or policy of not conducting legally adequate individualized assessments based on reasonable judgment that relies on current medical knowledge and on the best available

[1] This is the date 45 days before Jane Doe A first filed her EEO complaint exhausting the claims the Class asserts here, and it is the appropriate date for commencement of the class period, which extended throughout the time of the administrative complaint, and which concluded—with a 90-day right to sue *de novo* on August 6, 2026. 29 C.F.R. § 1614.407(c); *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974); *Davis v. Rice (Dept. of Air Force),* EEOC Appeal No. 01900174 (Jan. 24, 1990); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798–99 (explaining that court proceedings after EEOC proceedings are *de novo*).

objective evidence of applicants and employees of federal agencies with actual or perceived disabilities or records of disabilities ("disabilities") as part of the medical clearance process;

b. Whether the State Department has a pattern, practice, and/or policy of denying medical clearances to federal employees and applicants for positions abroad based on disabilities;

c. Whether the State Department has a pattern, practice, and/or policy of denying medical clearances to federal employees and applicants for positions abroad with disabilities based on fears, assumptions, and speculation about their diagnoses, treatment, and/or symptoms;

d. Whether the State Department has a pattern, practice, and/or policy of not engaging in a timely, good-faith interactive process with federal employees and applicants for positions abroad with disabilities before denying medical clearances on the basis of their disabilities;

e. Whether the State Department has a pattern, practice, and/or policy of failing to offer and/or consider reasonable accommodations prior to denying medical clearances based on employees' and applicants' disabilities;

f. Whether the State Department has a pattern, practice, and/or policy of not considering reasonable accommodations available in or near the country or site at which the federal employees and applicants for positions abroad are invited to serve when denying medical clearances based on employees' and applicants' disabilities;

g. Whether the State Department has a pattern, practice, and/or policy of failing to conduct a direct threat analysis under 29 C.F.R. §1630.2(r) as to any federal employees and applicants for positions abroad with disabilities before denying medical clearances on that basis;

h. Whether any or all of the State Department's above-listed patterns, practices, and/or policies resulted in the rescission of conditional offers of employment and/or opportunities to bid for employment to federal employees and applicants for specific posts abroad;

i. Whether any or all of the State Department's above-listed patterns, practices, and/or policies obstructed career progression opportunities for employment to federal employees and applicants with disabilities for specific posts abroad;

j. Whether any or all of the State Department's above-listed patterns, policies, and/or practices violate Section 501 of the Rehabilitation Act;

k. The appropriate types of monetary relief to provide to Plaintiffs and those similarly situated;

l. The appropriate injunctive relief to prevent prospective harm to Plaintiffs and those similarly situated; and

m. The appropriate declaratory relief.

29. Typicality: Plaintiffs' claims are typical of the claims of members of the proposed class. Plaintiffs were and are federal government employees or applicants for federal employment with actual or perceived disabilities or records of disabilities who were denied post-specific medical clearances by MED, and thus denied employment opportunities, on the basis of disability.

30. Adequacy: Plaintiffs will fairly and adequately protect the interests of the proposed Class, have no conflicts with the proposed Class's interests, and have retained counsel experienced in complex class litigation, including class disability discrimination litigation against federal agencies.

31. This case is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because the State Department has acted or refused to act on grounds that apply generally to the proposed Class, including by maintaining a pattern, practice, and/or policy of denying equal access, opportunities, and benefits of federal employment abroad to employees and applicants for employment with actual or perceived disabilities or records of disabilities based on their diagnosis, treatment, or symptoms, failing to conduct individualized assessments based on reasonable judgment that relies on current medical knowledge and on the best available objective evidence, and/or failing to offer or consider reasonable accommodations before denying post-specific medical clearances to applicants and employees based on disability, and because final injunctive relief, monetary relief, or corresponding declaratory relief is appropriate respecting the Class as a whole.

32. Class certification is also appropriate under Federal Rule of Civil Procedure Rule 23(b)(3) because questions of law and fact common to the proposed Class predominate over any questions affecting only individual members of the proposed Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The State Departments' uniform pattern, practice, and/or policy of failing to conduct individualized assessments and consider reasonable accommodations has stymied employees' careers and caused employees emotional and/or physical harm. The damages suffered by the individual proposed class members are small compared to the expense and burden of individual prosecution of this litigation.

Proposed Class members fear employment retaliation and being "blackballed" from obtaining future opportunities with the federal government. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the State Department's failure to conduct individualized assessments, consider reasonable accommodations, and conduct compliant undue hardship analyses.

33. Class certification may also be maintained under Federal Rule of Civil Procedure Rule 23(c)(4) because resolving the central question of whether the State Department systematically fails to conduct individualized assessments, consider reasonable accommodations, and/or conduct compliant undue hardship analyses with respect to employees with disabilities can be established with common proof using, for example, statistics, statements from State Department officials, and representative testimony and documents from class members. Thereafter, individual class members may be required to prove their individual entitlements to monetary recovery and the State Department would have an opportunity to present any affirmative defenses with respect to such individual Class members in *Teamsters* hearings. *See Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 361–62 (1977).

34. The Court may direct notice to all members of the proposed Class under Rule 23(c)(2). The names, email addresses, mailing addresses, and telephone numbers of the members of the proposed Class are available from the State Department because Class members are current and former applicants for medical clearance through the State Department.

## V. FACTUAL ALLEGATIONS

35. Plaintiffs, on behalf of themselves and the proposed Class, allege and incorporate by reference the allegations in the preceding paragraphs.

***The State Department, through MED, Denied the Putative Class Representatives and Hundreds of Others Post Approval Discriminatorily, Based Upon the Class Members' Disabilities, Records of Disabilities, and/or Perceived Disabilities.***

36. Medical clearances are required for most individuals sent by the U.S. Government to posts abroad for extended duty.

37. The Secretary of State is charged with establishing a health care program to "promote and maintain the physical and mental health of . . . eligible Government employees" and their family members abroad. 22 U.S.C. § 4084(a). Such health care program includes "medical examinations for applicants for employment." *Id.* at (b).

38. In determining whether to grant such clearance, MED consistently applies discriminatory policies, procedures, and practices that fail to engage in an interactive dialogue with, or individually assess whether, employees and applicants with disabilities can, with or without reasonable accommodation, perform the essential job functions of the particular positions they seek.

39. Among other legally-required factors, the State Department, in administering the post-specific medical approval process, does not: consider the costs of potentially accommodating someone's medical condition or placing an individual at a particular post; conduct an analysis of the hardships a post might incur from accommodating an individual at a particular post, or whether a particular individual would pose a direct threat to him/herself and others based upon his/her disability; consider the nature or job duties of the particular assignment an individual is seeking; or engage in interactive dialogue about disability accommodations with employees/potential employees and their treating medical professionals, instead making decisions about individuals' career and post approvals without exchanges with them or their medical providers who know them best.

40. MED determines medical clearances for not only State Department employees, but also for dozens of other federal agencies that employ Americans abroad. Offers of employment for assignments overseas from these agencies are typically made contingent on receiving MED clearance for the position.

41. In any given year, MED conducts thousands of medical clearance evaluations.

42. Agencies covered by MED include not only the State Department and USAID, but also the Broadcasting Board of Governors, Foreign Commercial Services, the Foreign Agricultural Service, the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, and many others. Medical clearances are adjudicated for all these agencies in a consistent manner by a small core of MED employees, typically 10 to 20 nurse consultants, overseen by several doctors and administrators.

43. According to the State Department's uniform policies, practices, and procedures, Class 1, "worldwide available," medical clearance is issued to individuals who have no identifiable medical condition that would, in MED's opinion, "limit" their assignment abroad. Individuals with Class 1 medical clearance must not have an identifiable medical or mental health condition that would require medical supervision or follow-up appointments that might "limit" their ability to be assigned to one or more posts abroad.

44. Any diagnosed condition, including disabilities and/or medical conditions that have caused an individual to be granted a clearance other than Class 1, are listed in the "Problems" tab of the individual's "eMED" medical record file, which is used during the medical clearance process. An individual with no ongoing medical condition will have nothing listed in their "Problems" tab.

45. A Class 2, or "Post-Specific," medical clearance is issued to individuals with a medical condition that would, in MED's opinion, "pose a significant risk to the health or safety of the individual or others if they were assigned to work at one or more posts abroad." The putative Class here, who were denied post approval on one or more occasions, at some point each received Class 2 and/or Class 5 medical clearances.

46. Individuals assigned a Class 2 medical clearance must obtain "post approval" before they are "paneled," or officially brought on duty for a position abroad. This requirement applies to all individuals with a Class 2 medical clearance employed by an agency falling under MED's aegis, including individuals seeking an "in-service" medical clearance, individuals seeking a direct transfer, and individuals working abroad on a temporary duty or "TDY" assignment for an aggregate of more than 60 days per year. Individuals seeking "in-service" medical clearance who are denied post-specific approvals for their current assignments are promptly removed from their positions overseas.

47. Post-specific approvals for Class 2 employees are evaluated by MED's nurse consultants, who do not necessarily speak with the employees or their medical providers, using the tools available to them within MED's Medical Capability Information ("MCI") database and with assistance from MED's Clearance Director and Senior Advisor as necessary. In using the MCI to adjudicate post approvals, MED only considers the resources available at the specific post where the individual is seeking an assignment. MED does not evaluate, for example, whether the resources necessary to accommodate an employee's condition might be available at another location, such as at a nearby post that can be reached easily and inexpensively. As a regular practice, MED does not meet directly with Foreign Service Officers who bid for post-specific

clearance; instead, Human Resources personnel act as go-betweens for the employees and MED clearance officials.

48. The MED post-approval process takes place without regard for reasonable accommodations. Reasonable accommodations are evaluated by the State Department's Disability and Reasonable Accommodations Division ("DRAD"), which entails a "separate process" from post approvals. DRAD does not communicate with MED in the post-approval process.

49. Rather than communicate with the individual seeking a post approval directly, MED communicates with the individual's Career Development Officer ("CDO") or other Human Resources representative, who submits a request for post approval (or multiple post approvals) on the employee's behalf. Once a request for post approval has been evaluated by MED, the results are communicated to the CDO, who then takes the necessary HR action regarding the individual's assignment.

50. An individual seeking post approval may already have a "handshake" offer from a particular post for a future assignment that is contingent on receiving post approval for that post. In other instances, an individual may be submitting one or more (potentially many) prospective future posts of assignment in advance of the formal bid cycle so as to accurately understand their options as limited by MED before the process officially begins. Regardless of whether there is a "handshake," an active service job, or merely a slate of prospective posts, MED treats all post approvals the same—*i.e.,* failing to consider accommodations, failing to perform adequate individualized consideration, etc.

51. Hiring Agencies rely entirely on MED's medical clearance decisions in rescinding conditional offers of employment to candidates with Class 2 and Class 5 medical clearances, where MED denies post-specific medical clearance. Hiring Agencies perform no reasonable

accommodations analysis of their own, nor do they hire candidates that receive Class 2 or Class 5 medical clearances without a sufficient post-specific medical clearance. Rejection of a candidate denied both Class 1 (worldwide available) or Class 2 (post-specific) medical clearance is automatic.

52. In addition to the formal post-approval process, employees and applicants with Class 2 medical clearance have often been encouraged to use the MCI's "Post-Approval Bidding Tool." The Tool provides unofficial guidance to employees as to which posts they might be assigned given their medical condition according to the same guidelines and policies MED's nurse consultants utilize in the post-approval process, *i.e.,* giving no consideration to an individual's particular experiences, job duties, reasonable accommodations, individualized circumstances, individuals/their doctors' opinions, etc. The Post-Approval Bidding Tool discourages Class 2 employees from seeking assignments at posts where the Tool indicates they will not be able to receive post approval.

53. In practice, the "Post-Approval Bidding Tool" and Class 2 medical clearance levels especially discourage and limit the number of "high-threat" posts that disabled employees and applicants (or those perceived as disabled) are able to seek. Designated "high threat" posts are desirable for employees stationed abroad because they come with additional financial incentives, including post-differential and hardship and danger pay boosts of up to 35% over standard grade levels and greater prestige within the international service community. *See, e.g.*, 5 U.S.C. §§ 5922, 5925, 5928. Inability to serve in hardship posts dampens the career prospects and trajectories of government employees stationed abroad.

***The State Department's Medical Clearance Policies and Practices Led to Discrimination Against Plaintiffs and Class Members***

Jane Doe A

54. As discussed above, Plaintiff Jane Doe A has a disability, cerebral palsy. It substantially limits her functioning in speaking, mobility, and other ways.

55. Despite her disability, she has worked in comparatively austere locations around the world, such as Libya, Egypt, Iraq, Jordan, the Philippines, and Vietnam, to promote the rights of people with disabilities and other vulnerable populations.

56. Jane Doe A has a master's degree in International Development and is fluent in Arabic and French.

57. Prior to the application at issue in this complaint, Jane Doe A served as an employee with the international non-governmental organization Mercy Corps. In that role, Jane Doe A had designed and managed disability support programs for humanitarian efforts in the Middle East and lived and worked in Iraq and the Middle East for over three years.

58. In February 2011, Jane Doe A was offered a USAID Foreign Service Limited ("FSL") position in Kabul, contingent on her obtaining medical and security clearances.

59. The State Department caused USAID's offer of employment to be revoked after MED denied Jane Doe A post approval for Kabul, concluding she "cannot be approved for any war zones." This was notwithstanding the fact that Jane Doe A had *already* worked successfully in war zones without incident.

60. MED's decision was expressly predicated on the claim that Jane Doe A would struggle to "wear the required body armor of at least 40 pounds." MED made this determination, denying her post approval, without giving her any test as to this skill or engaging in any dialogue with her or her doctors about this assessment, which was based upon a stereotype and generalized

assumptions concerning those with Jane Doe A's disability, cerebral palsy—not an individualized assessment of her actual mobility.

61. MED rejected Jane Doe A without discussing any reasonable accommodations with her or conducting any legally-compliant assessment of whether her supposed inability to don body armor would pose any undue hardship, burden on the State Department, or direct threat. Because of MED's clearance denial, she was denied the USAID position in Kabul, which would have been an important step forward in her career.

62. The State Department improperly denied Plaintiff Jane Doe A opportunities based upon her disability, record of disability, and/or perceived disability.

63. Plaintiff Jane Doe A's experience is illustrative of how the State Department's medical screening process discriminates against people with disabilities, including people with records of disabilities and perceived disabilities.

64. The State Department's decision to deny Jane Doe A post approval was consistent with the State Department's policies, practices, and procedures, which have resulted in hundreds of discriminatory post approval denials during the class period.

65. USAID, like other Hiring Agencies, relied entirely on the medical clearance determination from the State Department in the hiring process for Foreign Service Officers. Consequently, the Class 2 medical clearance issued to Jane Doe A was dispositive in USAID's decision not to employ her.

<u>John Doe A</u>

66. John Doe A entered the Foreign Service in 2017 as a Specialist with the State Department's Diplomatic Security Service. At the time, he was granted Class 1 "worldwide available" medical clearance. He assumed a post in Khartoum, Sudan, in or around March 2019.

67. While on leave from his Khartoum post in the United States, John Doe A was diagnosed with arthritis. If left untreated, the condition would substantially limit his mobility, and his ability to exercise, work and concentrate.

68. John Doe A submitted updated medical records to the State Department to reflect his new diagnosis on or around September 4, 2019. His updated medical records included *temporary* restrictions and limitations due to his diagnosis, including a limit on wearing body armor over 15 pounds, and his doctor's recommendation that John Doe A receive occasional blood tests and follow-up appointments for monitoring.

69. Within three weeks of submitting this updated medical clearance documentation to the State Department, John Doe A was curtailed from his position in Khartoum, Sudan based on downgraded medical clearance.

70. MED first gave John Doe A "Class 7" (pending) and then, on October 3, 2019, "Class 2," requiring post-specific clearance.

71. At no point prior to curtailing John Doe A from his position did the State Department consider whether John Doe A would be able to perform the essential duties of his position in Sudan with or without reasonable accommodations, or engage with John Doe A in an interactive process regarding reasonable accommodations.

72. On or around October 5, 2019, John Doe A met with his Career Development Officer regarding his downgraded Class 2 medical clearance. John Doe A was offered two alternative positions: service on the Secretary's Protective Detail or as a Desk Officer at State Department Headquarters in Washington, D.C. As a Desk Officer, John Doe A was informed he would be able to travel to several "high threat" locations on temporary duty assignments, but—

due to his Class 2 clearance—he would be denied approval for any long-term appointments in similar regions.

73. By December 2019, John Doe A's doctor lifted his temporary work restrictions, cleared John Doe A to resume the use of body armor, and determined that John Doe A's only ongoing medical needs were access to medication and biannual blood tests for monitoring.

74. In February and March of 2020, John Doe A sought the opinion of a second medical provider, who concurred with the first treater's opinions that John Doe A should be considered medically capable of service worldwide with access to medication and biannual blood tests for monitoring.

75. On information and belief, the medical clinic on site at John Doe A's post assignment in Sudan had the capacity to supply refills of John Doe A's medication and conduct basic blood tests to monitor his condition. Regardless, the State Department did not consider this reasonable accommodation before rejecting John Doe A for post approval in Sudan, or whether providing such accommodation would result in any undue burden on the State Department.

76. As a result of the State Department's discriminatory decision to remove John Doe A from his post in Sudan and deny his subsequent requests to return, John Doe A lost access to key employment benefits, including qualification for the Student Loan Repayment Program, hardship post incentive pay, access to R&R leave opportunities, and the opportunity to accrue additional home leave of 15-days per year.

77. The State Department's decision to downgrade John Doe A's medical clearance and remove him from his post in Khartoum, Sudan was based on unfounded beliefs about his disability and was not supported by any individualized assessment of his capacity to serve based on reasonable judgment that relies on current medical knowledge or objective evidence. The stated

reasons for John Doe A's removal were speculative, based on unwarranted assumptions, and contrary to the opinions and assessments of John Doe A and his medical providers.

78. The State Department improperly denied Plaintiff John Doe A opportunities based upon his disability, record of disability, and/or perceived disability.

79. Plaintiff John Doe A's experience is illustrative of how the State Department's medical screening process discriminates against people with disabilities, including people with records of disabilities and perceived disabilities.

80. The State Department's decision to deny John Doe A post approval was consistent with the State Department's policies, practices, and procedures, which have resulted in hundreds of discriminatory post approval denials during the class period.

John Doe B

81. John Doe B originally entered the Foreign Service in 2006 and was granted Class 1 "worldwide available" medical clearance. He served for seven years pursuant to this initial appointment and briefly left the Foreign Service in 2013.

82. In or around July 2014, John Doe B applied for reappointment to the Foreign Service. He received a conditional offer of reappointment on or around November 12, 2014.

83. On or around March 2, 2015, John Doe B informed MED of his recent diagnosis of Mantle Cell Lymphoma. If left untreated, the condition could substantially limit his ability to think, work, and concentrate, and could compromise his immune system. To manage his disability, John Doe B's doctor prescribed a medication that could contribute to a weakened immune system. John Doe B's oncologist recommended that he pause use of the medication when ill, receiving a vaccine, or undergoing a surgical procedure.

84. On or around May 19, 2015, John Doe B was notified that, because of his disability diagnosis, he had been assigned Class 5 “domestic only” medical clearance. Furthermore, MED decided that they would not reconsider this medical clearance decision until March 2016.

85. New applicants for the Foreign Service are required to receive Class 1 medical clearance for appointment. John Doe B appealed to the State Department, requesting a waiver from this requirement for his reappointment. His appeal was denied, and as a result, his application for reappointment was terminated.

86. John Doe B re-applied for reappointment in the Foreign Service in January 2017, and received a conditional offer on or around March 7, 2017. John Doe B was granted Class 1 medical clearance on August 30, 2017, and was able to resume his career with the foreign service.

87. Pursuant to State Department policy, newly re-appointed individuals are also prohibited from bidding on specific posts for their first assignment cycle. For this first assignment cycle, John Doe B worked domestically.

88. In May 2018, John Doe B received and accepted an offer for a two-year assignment in N’Djamena, Chad.

89. After a routine medical screening in September 2018 identified minor traces of lymphoma, John Doe B’s oncologist prescribed medication to maintain John Doe B’s remission. The only medical restrictions associated with John Doe B’s disability at this time were access to medication, which he could and would pause taking during periods of increased infection risk.

90. Nonetheless, MED determined that this screening and requirement would disqualify John Doe B from serving *anywhere* overseas for a time period and downgraded John Doe B’s medical clearance to Class 5, “domestic only.” Instead of assuming his post in Chad, John Doe B was assigned to a position in Washington D.C. as of September 2018.

91. After demonstrating a year of sustained remission on his medication, John Doe B was granted Class 2 medical clearance by September 2019, and was allowed to bid on overseas posts. In preparing his "bid list," John Doe B consulted his oncologist to determine what posts would be sufficient for his ongoing medical needs. In John Doe B's doctor's opinion, at its most severe, John Doe B's condition would require specialist consultation within about a week of a flare-up. As such, John Doe B primarily sought clearance for locations within a short flight of such care.

92. In September and October 2019, during his first round of bidding on overseas positions, due to his Class 2 clearance, the State Department rejected John Doe B's post-specific clearance for opportunities in Algiers, Baku, Cairo, Casablanca, Rabat, and Tunis, though he and his doctor agreed there was no medical reason for denying any of these posts.

93. Instead, John Doe B was assigned to a post in Paris, France. As a non-hardship post, the position offers lower compensation and fewer supervisory and promotional opportunities as compared to the posts John Doe B was prevented from bidding on.

94. On information and belief, in making this determination, the State Department did not assess whether John Doe B would be able to perform the essential duties of the positions at any locations above, with or without reasonable accommodation, or whether providing such accommodation would pose an undue burden on the State Department. MED did not engage with John Doe B in any kind of interactive process related to his medical clearance or applications for these posts, instead communicating through Human Resources, and apparently considering only the resources available on the ground for each post, regardless of John Doe B's actual medical needs.

95. The State Department improperly denied Plaintiff John Doe B opportunities based upon his disability, record of disability, and/or perceived disability.

96. Plaintiff John Doe B's experience is illustrative of how the State Department's medical screening process discriminates against people with disabilities, including people with records of disabilities and perceived disabilities.

97. The State Department's decision to deny John Doe B post approval was consistent with the State Department's policies, practices, and procedures, which have likely resulted in hundreds of discriminatory post approval denials over the class period.

***The State Department Discriminated Against Other Employees and Applicants in the Same Way as the Named Plaintiffs***

98. Numerous other employees and applicants experienced similar discrimination on the basis of their disability, records of disability, and/or perceived disability as the result of the State Department's medical clearance process. Examples of other applicants are described below.

<u>Employee 1</u>

99. Employee 1 entered the Foreign Service in 2009 and was granted Class 1, "worldwide available" medical clearance.

100. After experiencing a pulmonary embolism while assigned to a post in Brazil in 2014, the State Department downgraded her medical clearance from Class 1 to Class 2, "post-specific" clearance.

101. Employee 1 has a disability, perceived disability, and/or record of disability, based upon which the State Department wrongfully denied her employment abroad. Specifically, at all times after 2014, Employee 1 had a recorded history of pulmonary embolism and a history of an eating disorder, for which she was taking prescription medications.

102. Employee 1 had successfully managed her eating disorder with medication and talk therapy for over a decade, and she began taking prescription blood thinner medication following her pulmonary embolism in 2014.

103. On information and belief, at all relevant times the medications that Employee 1 required could be safely stored without special conditions, obtained overseas, mailed overseas, and obtained in larger supplies in advance to bring overseas as needed. Employee 1's therapy was conducted remotely.

104. Nonetheless, in 2015, MED denied Employee 1 post-specific medical clearance for an Assistance Coordinator post in Islamabad; a position for which Employee 1 had already received a handshake offer. MED premised this denial on the idea that Employee 1 might need an eating disorder specialist during her assignment and that one would not be available in Islamabad.

105. Prior to 2015, Employee 1 had never sought or received treatment by an eating disorder specialist and, on information and belief, could have obtained her usual medications and continued her remote talk therapy from Islamabad without issue.

106. Employee 1 appealed the denial of clearance to the Medical Review Panel, but her appeal was rejected.

107. Instead, she was offered a much less desirable and lucrative post in Washington, D.C. As a result, Employee 1 took a year off from the Foreign Service to return to school.

108. In or around 2018, Employee 1 bid on and received a handshake offer for a Staff Assistant position in Kabul. Once again, however, MED denied Employee 1 post-specific clearance, on the grounds that Employee 1 took blood-thinner medication. MED made its determination based on Kabul's supposedly limited capacity to manage bleeding from wounds in a war zone.

109. Employee 1 attempted to engage in an interactive process with MED, emailing the staff with offers to change her medication, requests to identify other options, and explanations that she had never experienced an adverse bleeding event. MED only notified Employee 1 of her option to appeal the decision.

110. Employee 1 appealed the clearance denial, including an opinion from her hematologist supporting her ability to safely serve in Kabul; nonetheless, her appeal was rejected.

111. On information and belief, in making Employee 1's clearance determination, MED did not consider the essential job duties of the position, the actual probability of suffering an injury at post, the robust medical services available at post in Kabul, or any possible accommodations. Instead, MED denied post-specific clearance based on speculative assertions of danger without individualized assessment or consideration.

112. In 2019, Employee 1 sent approximately 30 posts to MED for approval, and was denied clearance for most. Inter alia, Employee 1 was denied post-specific medical clearance for service at posts in Gaborone, Phnom Penh, Tbilisi, Tirana, Vilnius, Tunis, Nicosia, and Vladivostok. When Employee 1 requested explanation for her clearance denial for Vilnius, MED responded only that "there are not necessary resources" at that post.

113. At all times relevant to this Complaint, Employee 1 was a qualified individual with a disability under the Rehabilitation Act. Employee 1 was qualified for the positions for which she had been selected and the posts where she was interested in bidding, and she could have performed all essential functions of the positions with or without reasonable accommodation.

114. On information and belief, at no point did the State Department assess whether Employee 1 would be able to perform the essential job duties of the positions she sought in

Islamabad, Kabul, Gaborone, Phnom Penh, Tbilisi, Tirana, Vilnius, Tunis, Nicosia, or Vladivostok with or without reasonable accommodations.

115. Employee 1 requested no accommodation from the State Department that would have imposed any burden—let alone an undue burden—on the agency. The State Department did not ask Employee 1 about reasonable accommodations prior to denying her the opportunity to serve based on disability.

116. The State Department's decision was not supported by an individualized assessment based on reasonable judgment that relies on current medical knowledge and on the best available objective evidence, including the resources available at or near the specific location where Employee 1 was to serve, or the job duties of Employee 1's offered position.

117. Rather, the State Department improperly denied Employee 1 opportunities based upon her disabilities, record of disabilities, and/or perceived disabilities.

<u>Employee 2</u>

118. Employee 2 has a disability, perceived disability, and/or record of disability, based upon which the State Department wrongfully denied him employment opportunities abroad.

119. Specifically, Employee 2 has an inherited blood condition called hemochromatosis, which is caused by excessive iron building up inside his body. If left untreated, Employee 2's condition could potentially cause pain and substantially limit his walking, sitting, and other body movements. Excessive iron can also put a burden on Employee 2's organs and increase his chances of getting cancer, diabetes, or other medical conditions.

120. Employee 2 successfully manages his condition by having blood drawn (a phlebotomy) every three to four months; however, his doctors have indicated that it would be safe for him to wait up to three years between drainages. Phlebotomies are simple and can be performed

anywhere. The process takes no more than twenty minutes and only requires a needle, a plasma bag, and someone to administer the procedure.

121. Employee 2 entered the Foreign Service in 2010; at first, due to his hemochromatosis, he did not receive the necessary Class 1 medical clearance to proceed. After successfully appealing this decision, however, Employee 2 was granted Class 1, "worldwide available" medical clearance in February 2010 and began his foreign service career.

122. While stationed in Frankfurt, Germany in July 2012, the State Department downgraded his medical clearance from Class 1 to Class 2, "post-specific" clearance. Employee 2 was not consulted or even informed about the downgrade at the time until he sought new assignments in Vancouver, Canada.

123. Employee 2 was informed of his downgraded medical clearance when he was denied post-specific approval for a new assignment in Vancouver, Canada. Instead, he was posted to Tijuana, Mexico, after completing his service in Frankfurt with a State Department official stating that Employee 2 would have easy access to an American hematologist at post because "Tijuana is virtually part of San Diego."

124. In 2014, Employee 2 provided the State Department with a letter from his doctor stating that he would "be able to work and travel as needed with no restrictions" alongside his bids for post approval to Guadalajara, Halifax, and Vancouver. Nonetheless, he was denied post-specific clearance for those locations. Arbitrarily, at the same time, he was medically cleared to serve in Namibia and Tijuana.

125. As a result, Employee 2 served in two consecutive tours in Tijuana, first as a Consular Officer, and subsequently as a Management Officer. On information and belief, the

restrictions on his medical clearance and ability to serve at other posts frustrated his career progression in the Foreign Service and cost him promotional opportunities.

126. On information and belief, at all relevant times Employee 2 could have accessed routine phlebotomy treatments at any of the posts he applied for; indeed, there would be very little difference between traveling from Tijuana to San Diego for treatment and traveling from Vancouver to Seattle. In the event that Employee 2 could not access phlebotomy treatments on site, according to his doctors, he could wait for up to three years between treatments—longer than the standard two or three year assignments he sought as a Foreign Service Officer.

127. At all times relevant to this Complaint, Employee 2 was a qualified individual with a disability under the Rehabilitation Act. Employee 2 was qualified for the positions he had selected and could have performed all essential functions of the positions with or without reasonable accommodations.

128. On information and belief, at no point did the State Department assess whether Employee 2 would be able to perform the essential job duties of the positions he sought in Guadalajara, Halifax, or Vancouver with or without reasonable accommodations.

129. Employee 2 requested no accommodation from the State Department that would have imposed any burden—let alone an undue burden—on the agency. The State Department did not ask Employee 2 about reasonable accommodations prior to denying him the opportunity to serve based on disability.

130. The State Department's decision was not supported by an individualized assessment based on reasonable judgment that relies on current medical knowledge and on the best available objective evidence, including the resources available at or near the specific location where Employee 2 was to serve, or the job duties of Employee 2's offered position.

131. The State Department improperly denied Employee 2 opportunities based upon his disabilities, record of disabilities, and/or perceived disabilities.

Employee 3

132. Employee 3 entered the Foreign Service in 2009 and was granted Class 1, "worldwide available" medical clearance.

133. While serving on assignment in Riyadh in 2014, the embassy physician detected that Employee 3 had a heart murmur and would need to see a cardiologist. The cardiologist diagnosed Employee 3 with Aortic Valve Disorder, which if left untreated would severely impact Employee 3's overall health, ability to work, and mobility.

134. In treatment for his disability, Employee 3 underwent an aortic valve replacement surgery. As ongoing maintenance for his disability, Employee 3 required testing every two weeks and a blood thinner medication. This treatment allowed Employee 3's heart to stabilize and function well between 2014 and 2016.

135. Nonetheless, based on his disability, the State Department wrongfully denied him employment opportunities abroad.

136. While assigned to a post in Kuwait in November 2015, Employee 3 applied for and was offered a promotional opportunity in Sana'a, Yemen. The promotion had an anticipated start date of September 2018, and Employee 3 was informed that embassy staff assigned to Sana'a were working from Jeddah, Saudi Arabia due to suspended embassy operations in Yemen as a result of ongoing conflict.

137. Employee 3 received medical clearance for this position.

138. Shortly thereafter, Employee 3 was promoted within his position in Kuwait to a level equivalent to his promotional assignment in Yemen as scheduled to begin in September 2018.

139. At or around the same time, a still higher-level position in Yemen, Chief Political/Economic Officer, opened up operating out of the same Jeddah location for which Employee 3 had received post-specific approval.

140. Employee 3 applied for this new position as well, after determining that it presented an excellent career opportunity. He was offered and accepted this new position on November 16, 2016, with an anticipated start date in May 2017, and notice that all Yemen staff were still operating out of Jeddah for the foreseeable future.

141. At onboarding for this new position, Employee 3 was informed that he would need to receive post-specific approval for this new offer despite having received post-specific approval for another position at the same post within the prior year. Nonetheless, Employee 3 cooperated with State Department staff to apply for medical clearance for the new role.

142. In late 2016, Employee 3 submitted additional documentation from his cardiologist attesting to his "very good general condition, symptom free, with excellent physical capacity," and noting that his condition had been stable for the previous two years. On December 22, 2016, Employee 3 was issued post-specific clearance to serve in Sana'a.

143. On January 9, 2017, however, Employee 3 received updated communications from MED determining that he in fact had post approval for Jeddah but not Sana'a.

144. Employee 3 asked his career development officer to confirm that this would not be an issue, as the position was unlikely to require travel to Sana'a itself due to the ongoing conflict.

145. Over the next few weeks, his CDO communicated frequently with the State Department assignments team responsible for paneling Employee 3 into the Chief Political/Economic Officer position to determine whether the clearance designation would prevent

him from serving in Jeddah. The Yemen Affairs Unit leadership also reached out to the assignments team to encourage them to allow Employee 3 to go to post in Jeddah.

146. In January 2017, Employee 3 was informed by his CDO that he would be allowed to serve in the position per the assignments officer.

147. In spite of this communication, Employee 3 was notified on or around February 23, 2017 that he would not be eligible to serve at post in Jeddah due to the denial of his medical clearance for Sana'a.

148. Employee 3 was informed that State Department regulations would prevent them from assigning him to post for Sana'a regardless of the embassy's actual location. Because of these restrictions, Employee 3 was also informed that his prior offer for a position at the same post to begin in September 2018 was being rescinded.

149. Around early March 2017, Employee 3 appealed the MED Office's decision regarding the denial of post-specific medical approval. His appeal materials included Employee 3's earlier medical clearance approval for the 2018 Sana'a/Jeddah post, a medical report from his cardiologist, and his own statement on why the denial was unwarranted.

150. Upon receipt of the appeal, even MED officers expressed confusion as to why such an appeal would be necessary given that he was cleared to serve at the location where he would actually be posted.

151. Despite this, Employee 3's appeal was unsuccessful and both assignment offers in the Yemen Affairs Unit were rescinded.

152. Employee 3 further appealed the matter to the Director General's Office, but they declined to overturn the decision to rescind both assignment offers for the Yemen Affairs Unit.

153. On information and belief, at the time Employee 3's post-specific clearance was denied, it was highly unlikely that Employee 3 would have travelled to Sana'a in the role he was offered. To date, the embassy in Sana'a remains closed; it has not resumed operations since the initial suspension in 2015.

154. Following the rescission of his offers to serve with the Yemen Affairs Unit, Employee 3 has been denied post-specific medical clearance for roles in Erbil, Sarajevo, Jakarta and Algiers.

155. At the conclusion of his assignment in Kuwait, Employee 3 accepted a desk officer position in Washington, D.C. He did not hold another position at the promotional level comparable to the second Sana'a post offer for another 6 years, until 2023.

156. At all times relevant to this Complaint, Employee 3 was a qualified individual with a disability under the Rehabilitation Act. Employee 3 was qualified for the positions he had been selected for and could have performed all essential functions of the positions with or without reasonable accommodations.

157. On information and belief, at no point did the State Department assess whether Employee 3 would be able to perform the essential job duties of the positions in Sana'a, Yemen with or without reasonable accommodations.

158. Employee 3 requested no accommodation from the State Department that would have imposed any burden—let alone an undue burden—on the agency. The State Department did not ask Employee 3 about reasonable accommodations prior to denying him the opportunity to serve based on disability.

159. The State Department's decision was not supported by an individualized assessment based on reasonable judgment that relies on current medical knowledge and on the best

available objective evidence, including the resources available at or near the specific location where Employee 3 was to serve, or the job duties of Employee 3's offered position.

160. The State Department improperly denied Employee 3 opportunities based upon his disabilities, record of disabilities, and/or perceived disabilities.

Employee 4

161. Employee 4 has a disability, perceived disability, and/or record of disability, based upon which the State Department wrongfully denied her employment opportunities abroad.

162. Specifically, Employee 4 has a diagnosis of Post-Traumatic Stress Disorder ("PTSD"), which, if untreated, would substantially limit her ability to concentrate, work, and sleep. Her condition developed as a result of her service in the United States Air Force in Afghanistan. Employee 4 engaged in an effective course of treatment for her PTSD, such that it does not limit her ability to work as a civilian government official abroad, including in war zones.

163. In early March 2016, while working as an Asylum Officer for the Department of Homeland Security ("DHS"), Employee 4 received a job offer for a position as a DHS Refugee Officer. Refugee Officers have no set location for posting; rather, the post depends on where the State Department determines that refugees will be accepted in any given year. Employee 4's Refugee Officer employment offer was contingent on receipt of a Class 1 "worldwide available" medical clearance from the State Department.

164. On June 9, 2016, Employee 4 was informed that she received Class 2 "post-specific" medical clearance, and that she was expressly denied post approval for Iraq. MED employees communicated that a State Department doctor had decided that she should not be sent back to a war zone because of her diagnosis of PTSD. As a result, DHS rescinded Employee 4's offer of employment as a Refugee Officer.

165. The Refugee Officer position was a promotional opportunity for Employee 4, which would have allowed Employee 4 to pursue further opportunities aligned with her values and career goals. Instead, once the offer was rescinded, Employee 4 had to take a position as an Immigration Officer to continue her career at DHS with fewer incentives and benefits relative to the Refugee Officer position.

166. At all times relevant to this Complaint, Employee 4 was a qualified individual with a disability under the Rehabilitation Act. Employee 4 was qualified for the position she had been selected for and could have performed all essential functions of the positions with or without reasonable accommodations.

167. On information and belief, at no point did the State Department assess whether Employee 4 would be able to perform the essential job duties of the Refugee Officer position in Iraq with or without reasonable accommodations. On information and belief, the State Department did not consider Employee 4's extensive travel to cities abroad following her PTSD diagnosis without medical emergency, including routine visits to family in Mexico in cities with regular shoot-outs and explosions without exacerbating her symptoms, as well as travel to Colombia, Serbia, Croatia, Cuba, Guatemala, and other countries with high risk of civil unrest or possibly triggering violence conditions.

168. Employee 4 requested no accommodation from the State Department that would have imposed any burden—let alone an undue burden—on the agency. The State Department did not ask Employee 4 about reasonable accommodations prior to denying her medical clearance based on her disability.

169. The State Department's decision was not supported by an individualized assessment based on reasonable judgment that relies on current medical knowledge and on the best

available objective evidence, including the resources available at or near the specific location where Employee 4 was to serve, or the job duties of Employee 4's offered position. On information and belief, at no point did the State Department take into account the differences between the Air Force service in Afghanistan that brought on Employee 4's PTSD diagnosis and the essential duties of the Refugee Officer position for DHS in Iraq.

170. The State Department improperly denied Employee 4 opportunities based upon her disabilities, record of disabilities, and/or perceived disabilities.

Additional Proposed Class Members

171. In addition to the four examples identified above, numerous other individuals experienced similar discriminatory treatment by the State Department in medical clearance determinations, including additional Foreign Service Officers, Civil Service Officers, and limited-term employment applicants who were denied post-specific approvals due to disabilities ranging from major depressive disorder to sleep apnea, without individualized consideration or evaluation of possible reasonable accommodations that would enable them to perform the essential duties of their positions.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TOLLING

172. Plaintiffs exhausted available administrative remedies before filing this Complaint.

173. On June 30, 2011, Plaintiff Jane Doe A contacted a USAID EEO counselor and complained of discrimination by the State Department and USAID.

174. On September 2, 2011, Jane Doe A amended to include class discrimination claim as to both the State Department and USAID with USAID EEO. On November 21, 2011, after EEO counseling, she formally filed her class complaint. Both her informal and formal class complaints were raised on behalf of people given medical clearances below Class 1 (*i.e.,* not worldwide available) and being denied appointment opportunities on account of such, due to the "inadequate

medical clearance system which denied…individualized consideration and reasonable accommodations."

175. On January 5, 2012, USAID acknowledged receipt of Jane Doe A's class complaint and confirmed that "the complaint was also filed against the State Department, which they acknowledged as EEO Case Number DOS-F-120-11," and which was "forwarded to the Equal Employment Opportunity Commission … pursuant to the EEOC's Class Complaint Regulations in Title 29 Code of Federal Regulations (C.F.R.) Part 1614.204."

176. At the EEOC, Jane Doe A sought to have her class complaint subsumed within the related case *Meyer v. State Department*, which similarly concerned alleged disability discrimination in the State Department medical clearance process and which was certified as a class action in 2010 and settled for $37.5 million. This request was denied by the EEOC's Administrative Judge on April 8, 2013, because the *Meyer* action encompassed applicants for the career Foreign Service denied Class 1, worldwide available clearance, whereas Jane Doe A's case encompassed anyone experiencing MED denial of post-specific approval.

177. From April 2013 on, Jane Doe A proceeded with her own class allegations independently at the EEOC. Both her informal and formal class complaints were raised on behalf of people given medical clearances below Class 1 (*i.e.,* not worldwide available) and being denied appointment opportunities on account of such, due to the "inadequate medical clearance system which denied…individualized consideration and reasonable accommodations."

178. On April 18, 2013, the State Department first moved to dismiss Jane Doe A's complaint, arguing that Jane Doe A had not stated a claim against it, as the State Department "does

not control USAID appointments, nor can it extend or revoke a conditional offer or final offer of employment for an appointment with USAID."[2]

179. On December 19, 2016, with the State Department's 2013 dismissal motion still pending, the State Department again moved to dismiss Jane Doe A's class complaint, alleging that the only "policy or practice" Jane Doe A had identified per 29 CFR § 1614.204(d)(2) was the "worldwide availability" practice already challenged in *Meyer*.

180. On September 13, 2017, EEOC Administrative Judge Mary E. Palmer denied the motions.

181. In April 2013, Jane Doe A submitted a motion to conduct pre-certification discovery. Approximately 4.5 years later, in September 2017, with no discovery having yet been permitted, Judge Palmer heard the motion and ruled that Jane Doe A could conduct some pre-certification discovery.

182. Per Judge Palmer's ruling, USAID and the State Department produced limited discovery responsive to a fraction of Jane Doe A's discovery requests. Also in 2017, the parties jointly moved to enter a consent protective order preserving the confidentiality of putative Class members' medical records and other sensitive information.

183. In January 2019, Jane Doe A agreed to a settlement of her claims only with USAID based upon, among other things, USAID's unqualified admission that it relies entirely on the State Department to adjudicate medical clearances for overseas employees. The text of the aforementioned USAID settlement expressly preserved all of Jane Doe A's claims against the State Department.

[2] CF 671-679, April 18, 2013, U.S. Department of State's Motion to Dismiss.

184. Despite this, shortly before her untimely passing, Judge Palmer construed Jane Doe A's settlement with USAID as dismissing the entirety of her claims, including her claims against the State Department.

185. On April 13, 2020, Jane Doe A's EEOC matter was reassigned to Administrative Judge David Norken with Jane Doe A's motion for reconsideration still pending. Reversing Judge Palmer's ruling, Judge Norken reopened Jane Doe A's case against the State Department and denied the State Department's motion to dismiss, finding that the State Department acted as Jane Doe A's "joint employer."

186. On July 13, 2020, Judge Norken also granted Jane Doe A's Renewed Motion for Pre-Certification Discovery with a revised proposed Class definition of "all applicants to and employees of the U.S. Government denied post-specific medical clearance by the U.S. Department of State from May 16, 2011 to present," specifically ordering the State Department to produce redacted eMed records for a randomized selection of individuals meeting the new proposed Class definition. Judge Norken further indicated that it would "be a good idea" for Jane Doe A to identify additional prospective class agents.

187. Pursuant to Judge Norken's order, the State Department produced the records and contact information of roughly 300 individuals meeting the prospective class definition, some of whom agreed to provide declarations testifying to the State Department's discriminatory medical clearance policies.

188. Two of the identified proposed class members, one of whom was John Doe A, became additional putative class representatives.

189. On January 14, 2021, following Judge Norken's retirement, Administrative Judge Allyson Jozwik was assigned to Jane Doe A's matter. On March 24, 2021, Judge Jozwick granted

the parties' joint request to close pre-certification discovery on March 31, 2021 and set June 25, 2021 as the due date of Jane Doe A's Motion for Class Certification.

190. The parties stipulated that the Jane Doe A could move to add additional class agents as part of their Motion for Class Certification. Jane Doe A did so timely.

191. In her reply to the State Department's opposition to certification, due to ostensibly atypical/individual issues presented by one of the proposed class agents, Jane Doe A substituted John Doe B for her prior suggestion as a third proposed class agent.

192. In February 2022, after considering an additional motion to dismiss and class certification opposition briefing from the State Department, the Administrative Judge denied the State Department's motion to dismiss.

193. After conducting multiple hours of oral argument on the class certification motion, on December 9 and 14, 2021—and considering supplemental briefing on several points regarding class certification supplied by the parties in March 2022—the Administrative Judge granted Jane Doe A's motion for class certification and allowed for the addition of John Does A and B as class agents.

194. In response, the State Department issued a Final Agency Decision rejecting the Administrative Judge's order and appealed the order on July 14, 2022. Plaintiffs timely opposed the appeal on September 30, 2022.

195. On August 6, 2026, the EEOC issued a five-page decision decertifying and dismissing the class action, and notifying Jane Doe A of her ninety-day deadline to pursue her case *de novo* as a civil action in an appropriate United States District Court. 42 U.S.C.A. § 2000e-16; *Farrell v. Principi*, 366 F.3d 1066, 1067–68 (9th Cir. 2004) (noting that a claimant may seek *de novo* review of the disposition of an administrative complaint within 90 days of receipt by filing a

civil action in district court). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798–99 (1973) (explaining that court proceedings after EEOC proceedings are *de novo*).

196. The commencement of Jane Doe A's administrative class complaint on September 2, 2011, tolled the statute of limitations for class members to file individual EEO complaints alleging similar harms under the *American Pipe* doctrine. *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974); *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 344 (1983) ("The law is clearly established that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").

197. The purpose of administrative exhaustion—providing the State Department with an opportunity to investigate claims of systemic discriminatory impact on individuals with disabilities, and time to resolve the claim—was inarguably satisfied by Jane Doe A's class action complaint as filed with the EEO on September 2, 2011. The complaints of John Does A and B are "so similar that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges . . . [that] it would be wasteful, if not vain, to require separate EEOC filings." *Howard v. Gutierrez*, 571 F.Supp.2d 145, 158 (D.D.C. 2008) (citing *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981)).

198. The State Department has had fifteen years to reconsider and address the discriminatory policies and practices alleged in this case, and it has failed to do so. Given the long history of EEOC proceedings on the core class claims at issue in the instant case, awaiting further action from State Department on these individual claims prior to filing would be akin to rearranging deck chairs on the Titanic.

## CLAIM FOR RELIEF

**Violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791**
***Disability Discrimination***

199. Plaintiffs, on behalf of themselves and the proposed Class, allege and incorporate by reference the allegations in the preceding paragraphs.

200. The State Department is a cabinet-level Executive department within the executive branch of the United States government. 5 U.S.C. § 101. As an Executive department, the State Department is covered by Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, *et. seq.*

201. Section 501 prohibits, *inter alia*, employment discrimination against individuals with disabilities in the federal sector by Executive Agencies. The standards applied to determine violations of the Rehabilitation Act by U.S. government agencies are the same standards that apply to employment by private companies under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 *et seq*. Rehabilitation Act, 29 U.S.C. § 791(f).

202. Moreover, the State Department may not employ "qualification standards, employment tests or other selection criteria that screen out or tend to screen out…classes of individuals with disabilities, on the basis of disability, unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job related for the position in question and is consistent with business necessity." 29 C.F.R. § 1630.10(a).

203. The Rehabilitation Act requires that pre-employment, post-offer medical clearance examination that take into consideration whether an applicant with disabilities can perform the essential job functions of a position with reasonable accommodations. If not, then a determination must be made regarding whether the medical clearance criteria used are necessary to achieve the relevant business purpose. 29 U.S.C. § 791.

204. For years, the State Department has violated Section 501 of the Rehabilitation Act by unlawfully denying medical clearance to individuals with an actual or perceived disability, and/or record of such a disability without a legally-compliant individualized assessment. *Inter alia*, the State Department has maintained a pattern, practice and/or policy of:

a. unlawfully denying post-specific medical clearance to applicants with actual or perceived disabilities and/or records of disabilities access to and the benefits of employment based on disability;

b. failing to conduct legally-compliant individualized assessments of employees and applicants with actual or perceived disabilities and/or records of disabilities based on reasonable judgment that relies on current medical knowledge and on objective evidence;

c. denying employees and applicants with actual or perceived disabilities, and/or a record of such disability, opportunities to participate in and benefit from Foreign Service employment opportunities based on speculation and unwarranted assumptions or generalizations regarding their mental health conditions, symptoms, and/or treatment;

d. failing to consider, offer, or provide reasonable accommodations before denying positions to employees and applicants based on a disability; and

e. utilizing criteria or methods of administering its Foreign Service employment program and medical clearance process that have the effect of subjecting qualified employees and applicants with disabilities or perceived disabilities to discrimination on the basis of disability.

205. As a result of the above pattern, practice, and/or policies which violate the Rehabilitation Act, Plaintiffs and many other individuals have been denied medical clearances and have had our offers to work in Foreign Service posts abroad revoked based on disability.

**PRAYER FOR RELIEF**

206. WHEREFORE, pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a), Plaintiffs and the putative Class pray for judgment as follows:

A. Pecuniary and non-pecuniary damages for the Plaintiffs and Class members;

B. Declaratory relief that the State Department's methods of administering medical clearances violate the Rehabilitation Act;

C. Injunctive relief to ensure State Department's compliance with the Rehabilitation Act in administering medical clearances, including policy changes and staff training;

D. An opportunity for Plaintiffs and class members to have their offers reinstated and/or medical clearances reconsidered based on a nondiscriminatory evaluation of their current health;

E. Attorneys' fees and legal costs; and

F. For such other and further relief, in law or equity, as this Court may deem appropriate and just.

DATED: October 13, 2026

/s/ *Bryan J. Schwartz*

**BRYAN SCHWARTZ LAW, P.C.**
Bryan Schwartz (DC Bar No. 482960)
Erica Posey (CA Bar No. 356109)
(*pro hac vice* forthcoming)
180 Grand Avenue, Suite 1380
Oakland, California 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
(*pro hac vice* forthcoming)
Rebekah L. Bailey (MN 0389599)

(*pro hac vice* forthcoming)
80 South Eighth Street, Ste. 4700
Minneapolis, MN 55402
Tel. (612) 256-3200
Fax: (612) 338-4878
Email: morgan@nka.com
bailey@nka.com

*Attorneys for Individual and Representative Plaintiffs and the Putative Class*

**JURY TRIAL DEMANDED**

207. Plaintiffs and the proposed Class hereby demand a trial by jury in the above-captioned matter.

DATED: October 13, 2026

/s/ *Bryan J. Schwartz*

**BRYAN SCHWARTZ LAW, P.C.**
Bryan Schwartz (DC Bar No. 482960)
Erica Posey (CA Bar No. 356109)
(*pro hac vice* forthcoming)
180 Grand Avenue, Suite 1380
Oakland, California 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
(*pro hac vice* forthcoming)
Rebekah L. Bailey (MN 0389599)
(*pro hac vice* forthcoming)
80 South Eighth Street, Ste. 4700
Minneapolis, MN 55402
Tel. (612) 256-3200
Fax: (612) 338-4878
Email: morgan@nka.com
bailey@nka.com

*Attorneys for Individual and Representative Plaintiffs and the Putative Class*